**MILLCREEK TOWNSHIP POLICE ASSOCIATION, Appellant**

v.

**MILLCREEK TOWNSHIP.**

Commonwealth Court of Pennsylvania.

Argued Oct. 14, 2008.

Decided Nov. 21, 2008.

---

Eric C. Stoltenberg, Pittsburgh, for appellant.

Richard W. Perhacs, Erie, for appellee.

BEFORE: LEADBETTER, President Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge LEAVITT.

Millcreek Township Police Association (Association) appeals an order of the Court of Common Pleas of Erie County denying the Association's petition to vacate an arbitration award issued pursuant to the act commonly known as Act 111.[1] In this case we consider whether the arbitrator exceeded his jurisdiction by considering issues outside the scope of the grievances filed by two police officers, and whether the arbitration award unlawfully reduced the officers' retirement benefits. We affirm.

The Association and Millcreek Township have been parties to a series of collective bargaining agreements (CBA) governing the terms and conditions of employment of the Township's police officers. The first CBA pertinent to this case was effective from January 1, 2000, through December 31, 2002 (2000 CBA). Article 13(B) of the 2000 CBA provided post-retirement health insurance for police officers and their spouses in accordance with the following terms:

---

1. Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10. Act 111 governs employer-employee relations for police and fire personnel.

*ARTICLE 13—HEALTH, WELFARE AND PENSION*

\* \* \*

B. *Health.* . . . Upon retirement, the officer may at his option, continue his hospitalization insurance at the group rate with coverage provided for the retirees and their spouses of the group plan. Premiums will be paid by the Township for future retirees and their spouses as follows:

(1) The Township will pay the premium cost for an officer and spouse, coverage will be provided by Blue Cross and Blue Shield, or its equivalent, with the same or comparable benefits as before retirement.

\* \* \*

(4) The Officer will certify in writing to the Township at time of retirement and no less often than annually thereafter that he and his spouse are not eligible for hospitalization coverage without cost to them by virtue of other employment, spousal coverage, etc. Officers and their spouses who are eligible will not qualify for this benefit during such eligibility.

Reproduced Record at 36a–37a (R.R. ——). The 2000 CBA provided health insurance to its active and retired police officers through an indemnity plan type of coverage.

At the end of 2002, the Association and the Township agreed to extend the terms of the 2000 CBA until December 31, 2004. The contract extension also created a Deferred Retirement Option Program (DROP) for officers.[2] Under the DROP provision, an officer chooses a retirement date, after which he continues working and receives the same salary, sick days and vacation days as an active officer. During the DROP period, the participant's monthly pension benefits are paid into an interest-bearing account, available for withdrawal upon final separation from service. Final separation must take place no later than 36 months after the date the officer elects to enroll in the DROP. Participation in the DROP program is voluntary.

The Association and the Township negotiated a new CBA at the end of 2004, effective from January 1, 2005, through December 31, 2007 (2005 CBA). The 2005 CBA modified health insurance benefits for active and retired officers in several important ways. These new provisions, set forth in Article 13(A), stated as follows:

*ARTICLE 13—HEALTH, WELFARE AND PENSION*

A. *Health Insurance.*

(1) Effective January 1, 2005, health insurance/drug coverage shall change to a PPO for all current employees and retirees retiring after December 31, 2004. . . .

As used in Paragraphs (1), (2), and (3) below, the term "retired" means employees who apply for pension benefits after December 31, 2004.

(2) Retirees, or spouses of retirees, who are eligible for insurance from a source other than the Township, must take advantage of such coverage. If that coverage is not comparable to active employees' coverage or requires a payroll contribution by the retiree or spouse, the Township will reimburse that expense to the retiree or spouse. If the retiree or spouse exceeds a maximum limit of coverage under subsequent em-

---

**2.** The parties and the trial court also refer to the DROP as an In–Service Retirement Option Program (IROP).

ployer's plan, the Township plan's maximum will provide such coverage as secondary coverage.

\* \* \*

(5) All retired employees, regardless of the date of retirement, and their spouses, including participants in the DROP program, shall have the option, at any time after retirement, of choosing to accept the insurance program prevailing from time to time for active employees, under all of the terms and conditions prevailing for active employees....

R.R. 44a. The provisions of Article 13(B) of the 2000 CBA were retained in Article 13(A)(7) of the 2005 CBA. Thus, the Township was still required to pay the premium cost for Blue Cross and Blue Shield coverage, "or its equivalent, with the same or comparable benefits as before retirement," and retired officers were still required to certify annually that they were "not eligible for hospitalization coverage without cost to them by virtue of other employment, spousal coverage, etc." R.R. 45a.

Grievants in this case are Lieutenant Richard Figaski and Corporal Thomas Stepankow. Figaski enrolled in the DROP effective March 10, 2003, and actually separated from his employment with the Township on March 10, 2006. Stepankow enrolled in the DROP effective February 1, 2003, and separated on February 1, 2006. The DROP election form signed by both officers stated:

My participation in the DROP, the benefits or payment I will receive, the interest rate I will receive, and all of the terms and conditions of my participation will be governed by the prevailing collective bargaining agreement between [the Township] and [the Association], as amended or extended from time to time....

R.R. 80a, 81a. When the Township implemented the PPO plan in the 2005 CBA, it continued to provide Figaski and Stepankow with indemnity plan coverage during 2005. As their separation dates approached, however, the Township advised Figaski and Stepankow that they would have to take health insurance coverage available to them through their spouses.[3] In response, Figaski and Stepankow filed grievances.

The grievants asserted the coverage available through their spouses was not comparable to the Township's indemnity type coverage and was not available "without cost." The grievants requested to remain on the Township's indemnity plan and sought reimbursement for out-of-pocket expenses they had incurred while on their spouses' plans. In its written response to the grievances, the Township raised two arguments. First, the Township argued that each grievant did in fact have "available insurance coverage through his spouse 'without cost to them' as that term is used in the contract." R.R. 78a. Second, the Township contended that "[a]lternatively, the terms of Article 13, Section A(2) of the contract apply and limit the Township's obligations to providing secondary coverage and reimbursing certain expenses." Id. The matter proceeded to arbitration.

---

**3.** The Township advised Stepankow as follows in a letter dated January 30, 2006:

In accordance with Article 13(b) of the Collective Bargaining Agreement which was applicable at the time you entered the DROP, you are hereby notified that since insurance coverage is offered for you and your spouse at no premium cost, it is the opinion of Millcreek Township that you must enroll in that coverage.
R.R. 66a.

Before the arbitrator, the Association's position was that neither Figaski nor Stepankow had coverage available to them from their spouses "without cost" pursuant to Article 13(B) of the 2000 CBA. Stepankow testified that his wife's employer, the Department of Conservation and Natural Resources, offers an HMO plan at no premium cost. However, the Stepankows incurred higher out-of-pocket costs under Mrs. Stepankow's plan for prescriptions and chiropractic office visits. Figaski offered similar testimony regarding the PPO plan offered by his wife's employer, Millcreek Township School District. Mrs. Figaski's insurance is available at no premium cost, however certain co-pays, higher deductibles and more restricted coverage result in out-of-pocket expenses for the Figaskis. Mrs. Figaski may also opt out of her employer's health insurance in return for a higher salary. Figaski and Stepankow testified that they elected to participate in the DROP because they believed they were "locking in" the indemnity plan coverage they received under the 2000 CBA. Notes of Testimony, August 1, 2006, at 16, 30 (N.T. ——); R.R. 85a, 89a.

The Township's response was that Figaski's and Stepankow's post-retirement insurance benefits were governed by the CBA in effect when they ended their active service—the 2005 CBA. The Township's attorney began his case-in-chief by informing the arbitrator that

> [w]e don't think that the contractual language that [the Association's attorney] referred to that says that retired officers have to access spousal insurance if it's available at no cost to them comes into play, because we don't think that's what applies to these fellows. We think the current contract applies to these fellows because there was a change in 2005

that we think, with all due respect, applies to these fellows and to the grievance processed under that contract post 2005.

N.T. 39–40; R.R. 91a. According to the Township, this meant that the officers had to use their spouses' plans for primary coverage, with the Township providing secondary coverage and reimbursing the officers for any costs that would have been covered by the Township's plan had it been primary.

The Township presented the testimony of Township treasurer Gerald Wolf, who explained that the DROP application signed by Figaski and Stepankow is not the same as an application for pension benefits. An application for pension benefits is a separate document signed by a member at the end of his service, approximately one month before he begins drawing money out of the pension fund. Wolf verified that Figaski and Stepankow would have submitted their applications for pension benefits in late 2005 or early 2006. Wolf acknowledged on cross-examination that the Township treated Figaski and Stepankow as retired for insurance purposes while they were DROP participants, but for all other purposes they were treated as active employees governed by the 2005 CBA. For calendar year 2005, Figaski and Stepankow remained on the indemnity plan while other officers not in the DROP were enrolled in the new PPO plan.[4]

The arbitrator identified the main issue in the case to be: whether the Township violated the CBA by requiring Figaski and Stepankow to use their spouses' coverage as primary for health insurance benefits instead of allowing them to continue their indemnity plan coverage with the Township.[5] The arbitrator identified two key

---

4. The Township explained that this was an error.

5. The Township initially contested the arbitrability of the grievances, arguing that they

provisions in the 2005 CBA: (1) all active employees and those who retired after December 31, 2004, were switched over to the PPO plan and (2) retirees who were eligible for insurance from another source had to make such coverage primary. Because Figaski and Stepankow left active service after December 31, 2004, the arbitrator held that they were bound by the terms of the 2005 CBA. The arbitrator found especially persuasive the language in the DROP agreement, signed by Figaski and Stepankow, stating that benefits were subject to the terms and conditions of the "prevailing CBA." R.R. 80a, 81a. Noting that Figaski and Stepankow remained on the Township's indemnity plan after it was discontinued, the arbitrator concluded that they had been given a benefit to which neither they nor any active employees were entitled once the 2005 CBA took effect. The arbitrator denied the grievances, and the Association appealed to the trial court. The trial court affirmed, and the Association appealed to this Court.

█ The Association raises two issues for our consideration.[6] First, the Association argues that the arbitrator exceeded his jurisdiction by considering the 2005 CBA, because any issue arising from that agreement was outside the scope of the grievances filed by Figaski and Stepankow. The Association argues that the

original grievances dealt only with whether the spousal coverage available to Figaski and Stepankow was truly "without cost" to them, as specified in the 2000 CBA. Second, the Association argues that the arbitrator violated the officers' constitutional rights by diminishing their public retirement benefits. The Association asks this Court to remand the matter for the arbitrator to apply the "without cost" provision of the 2000 CBA.

█ We consider, first, the Association's argument that the arbitrator exceeded his jurisdiction by applying the 2005 CBA. The Association points to the language of the grievances filed by Figaski and Stepankow, which stated that the Township could not force them to elect their spouses' health insurance plans because those plans were not available "without cost," as specified in Article 13(B) of the 2000 CBA. The Association also points to the Township's notice to Stepankow which, citing "Article 13(B) of the Collective Bargaining Agreement which was applicable at the time you entered the DROP," required Stepankow to enroll in the insurance coverage "offered for you and your spouse at no premium cost." R.R. 66a. Accordingly, the Association contends that this Court should remand the grievance to the arbitrator for application of the correct contractual provision, which is found in the 2000 CBA.[7]

were filed by persons who were not active members of the Association. The arbitrator rejected that claim and held that the grievances were arbitrable. The Township has not appealed that determination.

6. An appellate court's review of an arbitrator's award in an Act 111 case is a very constricted one and is in the nature of narrow certiorari. *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5*, 564 Pa. 290, 295, 768 A.2d 291, 294 (2001) (*FOP, Lodge No. 5*). Narrow certiorari allows us to inquire into only four aspects of an Act 111 arbitrator's award: (1) the jurisdiction of the arbitrator; (2) the regularity of the arbitration proceed-

ings; (3) whether the arbitrator exceeded his authority; and (4) whether the arbitrator deprived one of the parties of constitutional rights. *Id.*

7. The Association raises a number of points in conjunction with its jurisdictional argument that do not really relate to the arbitrator's jurisdiction. For example, the Association contends that Figaski and Stepankow were led to believe their participation in the DROP locked them into the indemnity plan, and that the 2005 CBA exempts DROP participants from the new post-retirement medical benefits limitations if they applied for pension benefits prior to December 31, 2004. Many

Essentially, the Association argues that the Township raised the 2005 CBA too late in the proceeding for it to have been considered by the arbitrator. As authority for its position, the Association relies on the principle that an arbitrator exceeds his jurisdiction by considering issues not properly presented in the demand for arbitration. *FOP, Lodge No. 5,* 564 Pa. at 298, 768 A.2d at 296. *See also City of Philadelphia v. City of Philadelphia, Fraternal Order of Police, Lodge No. 5,* 717 A.2d 609, 611 (Pa.Cmwlth.1998) ("[A]rbitrators exceed their jurisdiction when they address questions not submitted to them by the parties.") (citing *Marple Township v. Delaware County FOP Lodge 27,* 660 A.2d 211 (Pa.Cmwlth.1995)). The foregoing authority, while instructive, is not dispositive because the case at bar is distinguishable from those cases.

For example, in *FOP, Lodge No. 5,* the union filed a demand for arbitration regarding a dispute with the City over a reduction in the number of Staff Inspectors in the bargaining unit. The union requested "that a promotional examination be scheduled immediately for Staff Inspectors. Make whole." *FOP, Lodge No. 5,* 564 Pa. at 293, 768 A.2d at 293. On the first day of arbitration, the union requested that the arbitrator also consider the issue of whether employees who were ranked lower than Staff Inspectors should be granted out-of-class pay for their performance of Staff Inspector functions. The City objected, arguing that the arbitrator could not consider this issue as it had not been raised prior to the first day of hearings. The Supreme Court ultimately held that the out-of-class pay claim was not encompassed within the union's demand for arbitration, and, therefore, the

arbitrator did not have jurisdiction to add that new issue "on the first day of the arbitration hearings *absent consent of all parties." Id.* at 298–299, 768 A.2d at 296 (emphasis added). *See also Marple Township,* 660 A.2d at 215 ("Arbitrators are required to address the issues submitted *within the context of the positions of the parties* and effectuate the relief requested.") (emphasis added).

Unlike *FOP, Lodge No. 5,* the consent of the parties was present here, albeit implicitly, to consider the 2005 CBA. The Township consistently raised alternative arguments in this case: (1) the 2005 CBA defined Figaski's and Stepankow's benefits and (2) even if the 2000 CBA controlled, they would not be entitled to the benefits they sought because coverage was available to the grievants through their spouses "without cost." These alternative defenses were asserted both in the Township's pre-arbitration written response to the grievance and in its oral presentation to the arbitrator on the first day of hearing. The Association did not question the propriety of the Township's 2005 CBA defense until it received an award it did not like.

■ The Association argues, next, that the arbitrator violated Figaski's and Stepankow's constitutional rights by diminishing their public retirement benefits, relying principally upon *Appeal of Upper Providence Police Delaware County Lodge # 27 Fraternal Order of Police,* 514 Pa. 501, 526 A.2d 315 (1987). We disagree with the Association's reading of the Supreme Court's holding.

In *Upper Providence,* an Act 111 interest arbitration award purported to eliminate the medical benefits of officers who had already retired. The Supreme Court

---

of the Association's arguments are reargument of the case it unsuccessfully made to the arbitrator.

held, quite narrowly, that since Upper Providence was a home rule municipality, it was prohibited by Section 302 of the Home Rule Charter and Optional Plans Law, 53 P.S. § 1–302(b)(iii),[8] from altering post-retirement benefits.[9] The Association exaggerates when it contends that *Upper Providence* stands for the proposition "that post-retirement medical benefits are vested upon entry into the retirement system and are constitutionally protected against modification." Association's Brief at 21–22. Indeed, the Supreme Court has expressly noted that Upper Providence should not be considered a constitutional case. *City of Pittsburgh v. Fraternal Order of Police, Fort Pitt Lodge No. 1,* 595 Pa. 47, 55 n. 8, 938 A.2d 225, 230 n. 8 (2007) ("It is important to note that *Upper Providence* did not issue any holding regarding constitutional issues.").

This Court's recent decision in *City of Pittsburgh v. Fraternal Order of Police, Fort Pitt Lodge No. 1,* 911 A.2d 651 (Pa. Cmwlth.2006), is instructive here. In that case, an Act 111 arbitration panel issued an award that capped the City's obligation to pay for post-retirement insurance at the cost prevailing on the date of the employee's retirement. On appeal, the union argued that any diminution of post-retirement insurance benefits below the level expected by employees violated the Contracts Clauses of the United States and Pennsylvania Constitutions. This Court held that the constitutions did not preclude changes in benefits, even when enjoyed post-retirement, if, as in the present case, the changes were the result of arms-length union contracts or Act 111 contract awards. Rather, constitutional concerns are raised when there are "unilateral change[s] in contractual benefits, not changes that are entered by mutual agreement in a contract or by an Act 111 panel." *Id.* at 653 (citing *City of Wilkes–Barre v. City of Wilkes–Barre Police Benevolent Association,* 814 A.2d 285, 288 (Pa. Cmwlth.2002)).[10]

It is apparent from the foregoing authority that, as the decisional law now

---

**8.** This section is now codified at 53 Pa.C.S. § 2962(c)(3). It states that a municipality shall not "[b]e authorized to diminish the rights or privileges of any former municipal employee entitled to benefits or any present municipal employee in his pension or retirement system."

**9.** The narrow basis of the Supreme Court's holding in *Upper Providence* is unmistakable:

The arbitrators' award eliminating post-retirement hospital and medical benefits for 1984 violated section 302 of the Home Rule Act as it constituted an illegal diminishment of retirement benefits to former and present employees. The stipulation of the parties narrowly defined the issue and the benefit in question, namely the illegality or legality of the "Medical after Retirement" provision which provided: "The full hospital and medical benefits in effect at the time of retirement … to continue annually after retirement until death." The arbitration award discontinued for 1984 the hospital and medical benefits after retirement until death, and thus "diminish[ed]" the rights or privileges of any former municipal employe entitled to benefits or any present municipal employe in his pension or retirement system." [Section 302 of the Home Rule Act]. Since the Township was prohibited by the Home Rule Act from voluntarily eliminating the post-retirement hospital and medical benefits for present and former employees, the award of the arbitrators eliminating those benefits for 1984 was illegal and thus in excess of the exercise of their powers.

*Upper Providence,* 514 Pa. at 515–516, 526 A.2d at 322.

**10.** The Supreme Court ultimately affirmed on different grounds, finding that the disputed retiree premium cap did not constitute a diminishment of benefits. The Court expressly declined to make any pronouncement on this Court's reasoning. *City of Pittsburgh v. Fraternal Order of Police, Fort Pitt Lodge No.1,* 595 Pa. 47, 55, 938 A.2d 225, 231 (2007).

stands, an award of the type at issue in the present case is not unconstitutional. The change in insurance benefits about which the Association complains was anything but unilateral, having been agreed to by the Association when it signed the 2005 CBA and by the grievants individually when they executed the DROP enrollment form. That election form, which the arbitrator viewed as highly significant, provided:

My participation in the DROP, *the benefits* or payment *I will receive,* the interest rate I will receive, and all of the terms and conditions of my participation will be governed by the *prevailing* collective bargaining agreement between [the Township] and [the Association], *as amended or extended from time to time*
. . . .

R.R. 80a, 81a. The "prevailing" agreement relevant to this case is the 2005 CBA. If Figaski and Stepankow did not wish to accept the possibility that subsequent agreements might alter their benefits, they were free not to elect to participate in the DROP. There was nothing "unilateral" about the change in health insurance benefits, or unconstitutional about the arbitrator's award affirming that the officers' insurance benefits were governed by the 2005 CBA.

For all of the foregoing reasons, we affirm the trial court's order.

### ORDER

AND NOW, this 21st day of November, 2008, the order of the Court of Common Pleas of Erie County dated February 15, 2008, in the above-captioned matter, is hereby AFFIRMED.